## Case No. 7,625.

### The KATHLEEN MARY.

[8 Ben. 165.] [1]

District Court, S. D. New York. June, 1875.

DELIVERY OF CARGO—STORAGE AND CARTAGE—BILL OF LADING—NOTICE—COSTS.

1. The steamer K. M. brought to New York from London 992 pieces of boxwood, under a bill of lading containing this clause: "The goods to be taken from alongside by the consignee immediately the vessel is ready to discharge, or otherwise they will be landed by the master, and deposited, at the expense of the consignee, and at his risk of fire, loss or injury, in the warehouse provided for that purpose, or in the public store, as the collector of the port of New York shall direct, and, when deposited in the warehouse or store, to be subject to storage." The consignees, having seen in the newspaper the announcement of the arrival of the steamer, entered their goods at the custom house on Saturday, February 8th, 1873, obtained a permit to land them, and sent it on board the vessel. The boxwood was scattered through the cargo, having been used as dunnage. On Monday the cartman of the consignees went on board the steamer. It was raining, and she was not discharging. She began to discharge on Tuesday. The cartman was on board on that day, but saw none of the wood, although some of it came out that day. On Wednesday he went again, and then saw twenty-two pieces which had been discharged. On Thursday he went again, and was told that he could probably have two truck-loads of the wood on Friday, and that it would probably be all out on Saturday, and he said he would like to get it all at one time. He did not go to the vessel on Friday. The freight was paid on Thursday. By Friday afternoon 718 pieces had been discharged, and on that afternoon they were sent by the ship to a warehouse for storage. On Saturday morning the cartman went again, and found 271 other pieces, which he took and receipted for. The consignees refused to pay either cartage or storage on the 718 pieces, and filed a libel against the vessel to recover the value of 721 pieces of the wood. What became of the three pieces besides the 718 did not appear: Held, that the libellant had full notice that the vessel was discharging cargo, and that some of the wood had been discharged, and that the rest was likely to come out at uncertain times.

2. The vessel was not bound, under the bill of lading, to keep the wood on the wharf for the consignees until it was all discharged, but she was bound to give the consignees a reasonable opportunity to take the goods; and, after affording such opportunity, she had the right to store the goods under the bill of lading.

[Cited in Unnerehr v. The Hindoo, 1 Fed. 629; Gronstadt v. Witthoff, 15 Fed. 275; Henderson v. 300 Tons Iron Ore, 38 Fed. 38.]

3. Such reasonable opportunity was afforded in this case, and the libellants were, therefore, not entitled to recover the value of the 718 pieces of wood, and the claimants of the vessel must have a decree for their costs, less the value of the three pieces.

In admiralty.

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

C. D. Adams, for libellants.
R. D. Benedict, for claimant.

BLATCHFORD, District Judge. The steamer Kathleen Mary brought to New York, from London, 992 pieces of boxwood, under a bill of lading, consigned to order, and endorsed in blank by the shippers, which contained the following clause: "The goods to be taken from alongside by the consignee immediately the vessel is ready to discharge, or otherwise they will be landed by the master, and deposited at the expense of the consignee, and at his risk of fire, loss or injury, in the warehouse provided for that purpose, or in the public store, as the collector of the port of New York shall direct, and, when deposited in the warehouse or store, to be subject to storage, the collector of the port being hereby authorized to grant a general order for discharge, immediately after entry of the ship." The bill of lading was transferred to the libellants, and came to their possession. The vessel arrived at New York, and, on the 8th of February, 1873, which was Saturday, the libellants noticed in a newspaper a statement that she had arrived, and, on that day, they entered the goods and obtained a permit to land them, and sent such permit on board of the vessel. On Monday, the 10th, the cartman of the libellants went on board of the vessel to see if she was discharging the boxwood. It was a rainy day, and the hatches were not open. On Tuesday, the 11th, the vessel began to discharge cargo. The cartman was on board of the vessel on that day. He testifies that none of the boxwood was out at the time he was there on Tuesday, and that he does not remember what time of day he was there. But Major, the stevedore who discharged the cargo, testifies, that, on Tuesday, some of the boxwood was discharged; that it was put up at the head of the dock; and that the same night it was moved to a place near the gangway of the ship, lest it should be stolen, and was watched by a man employed by the ship to watch cargo on the dock. The cartman went on board of the vessel again on Wednesday, the 12th. He was then told that some of the boxwood was out, and he then went back on the dock and saw some of it lying there. He says that he saw 22 pieces. The stevedore testifies that some was discharged on Wednesday. On Thursday, the 13th, the cartman went on board of the vessel again. He says that he did not then see any more of the boxwood, and was told by a person on board that there was no more of it out, but that he could have about two truck-loads the next day, and that probably all of the wood would be out on Saturday. He further says: "I said nothing about getting the two truck-loads. I told him I would like to get it all at once, if I could, the whole parcel, all of the boxwood, at one time." The stevedore testifies, that some of the boxwood was dis-

charged on Thursday; that what came out on Wednesday and Thursday was put in one lot, on the other side of the wharf, in a separate place from what had come out on Tuesday; and that quite a pile came out Wednesday and Thursday. On Thursday the libellants paid the freight on the entire shipment. The stevedore testifies, that, on Friday, the 14th, there was a lot of the wood discharged. The cartman did not go to the vessel on Friday. The wood discharged on the four days amounted to 718 pieces. On Friday afternoon these 718 pieces were sent to a warehouse for storage. On Saturday morning the cartman went to the wharf with trucks and there found 271 pieces of the wood. These had come out on Saturday, and were no part of the 718 pieces. The cartman took the 271 pieces and receipted for them. The warehouse keeper held the 718 pieces subject to the order of the vessel. The libellants refused to pay either cartage or storage on the 718 pieces, and bring this suit against the vessel to recover the value of 721 pieces out of the 992. Nothing is shown as to what became of the three pieces not included in the 271 or in the 718. The answer sets up that the libellants took part of the merchandise, but failed to take the remainder in accordance with the bill of lading, and it was deposited in warehouse in accordance with the contract of the bill of lading; and that all the merchandise was duly delivered to the libellants according to the terms and conditions of the bill of lading.

It appears by the evidence that the cartman was informed by the stevedore on board of the ship, and the stevedore says it was, on Tuesday, that the wood was probably scattered through the ship, being used as dunnage. It turned out that, in fact, the wood was scattered through the cargo in different places. A boy was caught stealing a piece of the wood on Tuesday, and then what there was of it on the dock was watched by the watchman, before mentioned, on Tuesday, Wednesday and Thursday nights. The vessel had an assorted cargo of about 1,400 tons, consigned to 30 or 40 different consignees, under bills of lading, all of which were like the one in this case. The ship had some iron as cargo, and the discharging of all of the cargo except the iron was completed on Saturday. It thus appears that some of the boxwood was discharged on each one of the five days on which the cargo was discharged. It was distributed through the whole cargo. The libellants had full notice through the cartman that the vessel was discharging cargo, and full notice by Wednesday, through the cartman, that some of the boxwood had been reached and discharged, and that the rest was likely to come out at uncertain times, when other cargo for which it was used as dunnage should be got out. When the cartman was there on Thursday he did not see any more boxwood on the dock than

the 22 pieces he had seen there on Wednesday; but what he so saw was what had come out on Tuesday, and there was a quantity there which came out on Wednesday and Thursday, and was put in one lot, on the other side of the wharf, in a separate place from what had come out on Tuesday. Then, again, the cartman was told, on Thursday, that he could have two truckloads on Friday. He said that he would like to get the whole at one time; and he said this in view of his having been told that probably the whole would be out on Saturday. Apparently to suit his own convenience, he did not go to the dock on Friday, nor until Saturday. Meantime, by Friday evening, 718 pieces of the wood were on the wharf, weighing over 18½ tons. There was danger of their being stolen. It was necessary to watch them. The cartman, after having been there daily, had failed to come that day. Although told on Thursday that there would be ready for him on Friday a quantity sufficient for him to take away, he had failed to come and take it. His suggestion that he would like to get the whole of the wood at one time can be regarded only as the announcement of his intention not to take any of the wood, though it was on the wharf and ready for him, and the freight was paid, until he chose to take it. It cannot be regarded as a contract binding the vessel, notwithstanding the terms of the bill of lading, to hold the wood for him upon the wharf until he should be able to get all the wood at once. The terms of the bill of lading are explicit, that the goods, when landed, are to be taken by the consignee from alongside as soon as they are landed, or, otherwise, they may be deposited, at the expense and risk of the consignee, in a warehouse, subject to storage. And it is by no means clear that this is not also a contract by the master, that, if he lands the goods, and they are not taken from alongside by the consignee when they ought to be taken the master will deposit them in a proper warehouse.

The libellants had every reasonable opportunity to remove their goods, and it is apparent that nothing prevented their obtaining and removing on Friday the 718 pieces, except the fact that their cartman, although fully notified on board of the ship, on Thursday, that there would be a sufficient quantity of the wood out on Friday for him to remove, entirely neglected his duty, and failed to go until Saturday with any means of removing any of the wood. Those in charge of the vessel gave a reasonable interpretation to the clause in the bill of lading. They did not send any of the wood to the warehouse before Friday evening, although none of it had been removed, and they waited, before sending it to the warehouse, until it had accumulated on the wharf in such quantities as to make several truck loads. It cannot be successfully contended that the bill of lading is necessarily to be so construed as to require the master to wait until all the goods named in the bill of lading are landed on the wharf, before he is at liberty to send any of them to a warehouse. That would be an unreasonable construction of such a clause. A bill of lading with such a clause may cover the entire cargo of the vessel, and, on such a construction of the clause, the consignee could compel the master to accumulate the whole cargo upon the wharf.

It is suggested that, the freight having been paid, the vessel had no lien upon the wood, and had no right to do anything with the wood except to land it on the wharf; that her duty towards the wood and towards the consignees ceased with such landing of the wood; and that she had no right to afterwards store the wood at the expense of the consignees. But this view proves too much. The suit is brought against the vessel in rem, on the contract in the bill of lading, for non-delivery of the wood. If the landing of the wood terminated the duty of the vessel, the landing was a delivery of the wood. Still further, in that view, the storing of the wood, even though wrongful as respected the consignees, and a ground of action for a remedy against some person, would afford no ground for a suit in rem against the vessel, on the bill of lading. But, after landing the goods, the vessel was bound to give the consignees a reasonable opportunity to take the goods. After affording such opportunity it had the right to store the goods, under the clause in this bill of lading.

The libellants are, therefore, entitled to recover the value of the 3 pieces of wood, but not of the 718 pieces, and the costs of the suit must be awarded to the claimant. The decree in favor of the claimant will be for such costs, less the value of the 3 pieces of wood.